**THIS OPINION HAS NO PRECEDENTIAL VALUE. IT SHOULD NOT BE CITED OR RELIED ON AS PRECEDENT IN ANY PROCEEDING EXCEPT AS PROVIDED BY RULE 268(d)(2), SCACR.**

**THE STATE OF SOUTH CAROLINA**
**In The Court of Appeals**

Monica Murphy, Claimant, Appellant,

v.

Halocarbon Products Corporation, Employer, and Commerce & Industry Insurance Company c/o AIG Claims, Inc., Carrier, Respondents.

Appellate Case No. 2022-001546

———————

Appeal From The Workers' Compensation Commission

———————

Unpublished Opinion No. 2024-UP-349
Submitted May 1, 2024 – Filed October 9, 2024

———————

**AFFIRMED**

———————

Frederick Ivey Hall, III, of The Rick Hall Law Firm, LLC, of Lexington, for Appellant.

James H. Lichty, of McAngus Goudelock & Courie, LLC, of Columbia, for Respondents.

———————

**PER CURIAM:** In this workers' compensation case, Monica Murphy (Claimant) argues the Appellate Panel of South Carolina Workers' Compensation Commission

(the Commission) erred in finding she was not entitled to workers' compensation benefits arising from a chemical exposure.  We affirm.

**FACTS/PROCEDURAL HISTORY**

Claimant worked as a Quality Control Laboratory Technician for Halocarbon Products (Employer) beginning in 2012.[1]  Employer is a chemical manufacturing company that produces intermediate fluorinated chemicals and anesthesia.  Many of Employer's products contain hydrofluoric acid (HF).

Claimant testified at the workers' compensation hearing (the hearing) that on August 11, 2015, she was wearing standard protective gear and left the laboratory to dump a bucket of hazardous waste.  She pushed open a door to a covered patio and breathed an "awful . . . pungent sharp chemical in the air."  Claimant recalled that she "coughed like [] choking, and got several breaths . . . trying to get the door pulled closed."  Claimant stated she took three to four breaths and felt as if she would collapse.  Claimant closed the door and did not go through it.  She recalled that her heart was pounding and she was short of breath immediately after the incident.  She then saw a coworker, Lonnie Parsons, who told her he was working on an HF leak in the area.  Claimant stated she saw two carboys (thick manufacturing containers) fuming white smoke.  Parsons took the hazardous waste bucket from Claimant, walked past the carboys, and dumped the waste in the chemical manufacturing area.  Claimant testified that Parsons did not show signs of physical distress after walking past the fuming white smoke.[2]

Claimant left the area and went to the control room to speak with Chip Babb, Employer's Assistant Production Manager, and to fill out an incident report.  Claimant testified she asked Babb for a calcium gluconate nebulizer —a treatment for injury caused by HF exposure—but Babb told her she just needed fresh air.  Employer's representative testified at the hearing that Claimant did not request calcium gluconate and none was administered because it was not deemed necessary.  Claimant told Babb that someone was going to get killed because of lax

---

[1] Before Employer hired Claimant, she worked as a lab technician at Savannah River Site for twenty-eight years.

[2] At the hearing, Employer's representative stated there was a leak that contained HF on the day of the incident but the amount of HF released was a "trace" amount and therefore was not measured.

safety. After sitting with Babb for roughly half an hour, Claimant felt slightly better and asked to go back to the lab to complete her shift, despite complaining of a headache, pounding heart, sinus burn, and dry mouth. After her shift, Claimant went home to rest but continued coughing and had dry, burning sinuses and mouth. She also experienced several bouts of diarrhea and abdominal pain.

Roughly twelve hours after the exposure, Claimant, accompanied by Ken McDowell, Employer's Director of Regulatory Affairs, visited an urgent care center (Urgent M.D.) to seek medical attention for Claimant (August 11 visit). A physician's assistant listened to Claimant's heart and lungs, performed a sinus X-ray, and drew blood. Records from the August 11 visit state Claimant's chest and lung exams revealed normal exertion and sounds and her cardiovascular exam indicated normal sounds and a regular rate and rhythm with no murmurs. Claimant's blood work was normal. She received no medication from her August 11 visit and was instructed to take ibuprofen to help with her headache. Claimant was released to regular work duty.

Two days after the exposure, Claimant revisited Urgent M.D. (August 13 visit) and complained of shortness of breath, sore throat, coughing, headache, nausea, numbness in her hands, and weakness. Medical records from the August 13 visit state Claimant did not suffer from rash, chest pain or pressure, fluttering in her chest, nausea, or abdominal pain. Claimant's chest, lung, and cardiovascular exams were normal; however, the physician's assistant arranged for Claimant to visit a hospital to have a chest x-ray and blood work completed. While at the hospital, Claimant was evaluated by a physician's assistant in conjunction with a physician, and her chest x-ray was reviewed by a physician. Claimant's cardiovascular exam showed her heartbeat was normal, and her pulmonary exam showed no respiratory distress, with normal effort and breath sounds. Claimant's blood results were normal, including her calcium and magnesium levels. She was prescribed an ipratropium-albuterol nebulizer solution, released from care, and placed on light-duty work restrictions with orders not to return to work until August 19.

Claimant stated at the hearing that she was in "overwhelming" pain on August 19 (August 19 visit) and returned to Urgent M.D. Her labs and chest x-ray were normal. Two EKGs were performed and showed "some conduction abnormality" that was possibly "chronic" in nature. The notes from Claimant's August 19 visit state that she "specifically mentioned she might have pulmonary edema and/or cardiac arrhythmia secondary to HF exposure." The medical record noted that Claimant's electrolytes had been normal on three separate visits, indicating she did

not have abnormalities that could cause arrhythmia. The physician's assistant at Urgent M.D. referred Claimant to a pulmonologist, an ENT, and a toxicologist after the August 19 visit.

Claimant returned to work on August 21 but began feeling faint and had to lie down and prop up her feet to get blood to her head because she had a severe cough and was experiencing respiratory distress. Claimant called her supervisor and explained her symptoms, and the supervisor called an ambulance. Claimant was admitted to the hospital on August 21. Dr. Patrick Aquilina, a cardiologist specializing in electrophysiology, found that Claimant suffered from atrioventricular (AV) heart block and required a pacemaker implant. Dr. Aquilina also diagnosed Claimant with hypophosphatemia and junctional bradycardia. Claimant never returned to work after August 21.

Claimant filed a Form 50 alleging injury to her heart, lungs, bones, smell, taste, neurological system, and mind/psyche arising from HF inhalation on August 11, 2015. Claimant testified at the hearing that before her exposure to HF, she was generally healthy. She was treated by a cardiologist in 2007 because of a "racing heart" and underwent a cardiovascular workup, which showed normal results. In 2010, she was hospitalized for a kidney infection, which revealed she suffered from slight tachycardia, a heart rate that exceeds the normal resting rate, but she stated she was told it was because of a fever. After her release from the hospital for the kidney infection, she did not receive any treatment for her heart. She further stated that she did whatever she pleased before the accident, except for activities that are more difficult for overweight people to perform. Claimant also suffered from osteoarthritis in her right hip and sacroiliac joint, which required physical therapy prior to her HF exposure. She denied having lung problems before the HF exposure and denied ever being told that she had restrictive lung disease. Employer's representative testified that Claimant failed pulmonary function testing (PFT) during the hiring process.

George D. Campbell, a chemical operator for Employer, testified at the hearing he inhaled the same HF leak as Claimant around the same time. He was exposed for two to three minutes. He warned Claimant not to go through the door because he "just got gassed."[3] Campbell testified he had not experienced any long-term health problems from the exposure.

---

[3] Claimant denied seeing Campbell.

Parsons testified at the hearing he worked on the HF leak on August 11 while wearing standard protective clothing, without a respirator, for about eight hours and suffered no adverse effects. He was no more than two to three feet away from the leak and sometimes stood "over top of it." Parsons stated he saw Claimant entering the area of the leak and told her to stay back. He stated Claimant did not appear to be in physical distress and was not coughing or red in the face. Parsons said there was "no way" he could have been in the area of the HF leak without developing physical symptoms if the HF levels were high.

Dr. Michael Mackinnon worked as the plant physician for Employer and also developed the protocols for HF exposure for Honeywell, a company which is the largest producer of HF in North America. He stated in deposition testimony,

> [T]he greatest controversy in this case is just how much exposure [Claimant] had to HF, both in length of time and in concentration of the alleged vapors. By her own statement, she opened the door to this area and smelled a foul odor, so she immediately closed the door and did not enter the patio at all.

Dr. Mackinnon opined that because of Claimant's brief exposure, there "was really no chance that any exposure to a toxic level of HF could have caused the many symptoms she complained of over the next two weeks." He further claimed that if she had a serious exposure, she would have had multiple other signs of physical injury within forty-eight hours after exposure. He noted that Claimant's heart problems did not begin until ten days after the incident. Dr. Mackinnon stated:

> [B]ased on the vast experience I've had with HF injuries, both at my plant location and, in effect, worldwide as a consultant, this whole scenario does not fit a typical [HF] exposure. First of all, there was a minimal amount of exposure for a short time, and in all chemical injuries it is the concentration and length of exposure that are the most important factors in tissue damage to an individual on exposure.

Dr. William Alleyne, a pulmonologist, diagnosed Claimant with reactive airways dysfunction syndrome (RADS) based on her statement to him that she had an HF exposure. Dr. Alleyne said in deposition testimony that Claimant's preexisting pulmonary disfunction did not affect his diagnosis. He stated Claimant's heart was

functioning normally before the HF exposure and the exposure caused a third-degree heart block. Dr. Alleyne refused to defer to a cardiologist when assessing Claimant's heart block because "this is a lady who had a defined exposure of a toxic material . . . . She goes to seek medical attention and essentially requires a permanent pacemaker for a third-degree heart block without any history of cardiac disease." He assigned a thirty-percent impairment rating to each of Claimant's lungs and opined Claimant could no longer work. Dr. Alleyne recalled that during the PFT he administered to Claimant, her result was a seventy-five, the normal range being between seventy and ninety.

Dr. Patrick Aquilina, the cardiologist who inserted Claimant's pacemaker, refused to give an opinion in deposition testimony as to whether the HF exposure caused Claimant's heart block because he did not have the training or knowledge base to evaluate it. Dr. Aquilina stated that he could not explain what caused Claimant's heart block because "we . . . see heart block in all age groups throughout patients' lives and we don't really know what causes them most of the time."

Dr. Kellie Lane, a cardiologist in practice with Dr. Aquilina, treated Claimant at the hospital on August 19. In deposition testimony, Dr. Lane said Claimant "had an issue with the [heart] rhythm related to the exposure primarily related to the severe respiratory issues that she was experiencing." Dr. Lane opined that based on Claimant's medical history of syncope, she had a "predisposition to arrhythmia" which was exacerbated by her respiratory reaction to the exposure.

Dr. Phillip Edelman, a toxicologist who authored the World Health Organization guidance concerning the toxicity of HF, wrote in a report that an HF exposure of below forty percent combined with other chemicals as he believed was likely here, would have caused Claimant's asthma. Dr. Edelman stated Claimant was "exposed to vented gases or vapors . . . for up to three minutes." Dr. Edelman stated Claimant's initial reactions to the exposure were typical of airway irritation with choking and coughing. He stated "the effects of HF are overwhelmingly delayed in their course." He noted "the published literature on the effects of HF on the heart is not helpful" and opined that because of preexisting abnormalities, Claimant's "heart was not normal and was more susceptible to the effects of any insult to the delicate conducting fibers in the heart." He also opined that the onset of the heart block related to the HF exposure was "probably more rapid than was actually diagnosed initially." Dr. Edelman found the effects were delayed and "the destruction of the tissues in this case was specific to the heart's conduction system, which was the first tissue in the body after her lungs that were exposed."

Dr. Barry Feldman reviewed Claimant's medical records and found "it is physiologically improbable that there is a causal relationship between [an HF exposure] and [Claimant's] high-grade heart block." He noted Claimant had been taking a beta blocker for one year prior to the exposure. He disagreed with Dr. Lane's opinion and described the heart block as "most likely secondary to primary conduction disease."

Dr. John Setaro, a cardiologist at the Yale University School of Medicine, reviewed Claimant's medical records. Dr. Setaro wrote that Claimant was exposed to "40% HF." He did not discuss the circumstances of Claimant's exposure and noted that "[e]ven a small exposure can lead to skin injury." He noted the possible disastrous effects of HF exposure and stated his opinion that Claimant's HF exposure "was a substantial causative factor" in Claimant's heart block. Dr. Setaro stated "no other conceivable reason was found or has been offered" for Claimant's heart block.

Dr. Gordon Early examined Claimant. He noted in a report that Claimant's inhalation exposure was for one to three minutes. Based on Claimant's medical history, he opined that her "arrhythmia and subsequent pacemaker are not attributable to or aggravated by her HF exposure." Dr. Early explained Claimant's blood labs were all completed within fourteen days after her exposure and her calcium and magnesium levels were normal. Dr. Early opined that Claimant's lab results were not surprising considering the short duration of her HF exposure and that electrolyte abnormalities occur within the first twenty-four hours after exposure. Dr. Early opined that Claimant's dyslipidemia, hypertension, and obesity were much more likely causes of her heart block than an HF exposure. Dr. Early noted Claimant's pre-exposure PFT results from 2008 to 2011 showed she had preexisting restrictive lung disease. Dr. Early stated Claimant's lung condition was likely worse after the HF exposure but any lung impairment rating must take into consideration Claimant's prior PFT results.

Claimant was seen by a Charleston pulmonologist, Dr. John Mitchell, in May 2016. Dr. Mitchell stated in the visit notes that Claimant described a "significant inhalational exposure" to him. Dr. Mitchell opined that Claimant's preexisting medical conditions of hypertension, bradycardia, need for beta blockers, and obesity were important contributing factors to her present diagnosis of total heart block. He stated Claimant had a restrictive pulmonary impairment dating back to at least 1993. He stated her Class 2 impairment rating predated the HF exposure. Dr. Mitchell explained that obese individuals generally have limited lung capacity and normal DLCO/VA, as in Claimant's case. He concluded "[i]f the DLCO/VA

were considered (a more accurate measure of her diffusion capacity=oxygen uptake ability) she would be considered a Class 0 with no impairment." Dr. Mitchell disagreed with Claimant's diagnosis of RADS because she did not have the typical obstructive limitation in her PFT results. Dr. Mitchell opined there was no causal relationship between the HF exposure and Claimant's heart block, Claimant had reached maximum medical improvement (MMI), and Claimant required no further treatment other than a recommendation of weight loss. At his deposition, Dr. Mitchell noted "a lot of people develop complete heart block for unknown reasons." Dr. Mitchell agreed with Dr. Early's findings.

Dr. Selwyn Spangenthal reviewed Claimant's medical records and stated the HF exposure did not have a long-term impact on her pulmonary system. He believed Claimant's pulmonary problems were attributable to her morbid obesity. He disagreed with Claimant's diagnosis of RADS based on her history, physical examination records, and PFT results. Regarding Claimant's cardiac complaints, Dr. Spangenthal deferred to cardiologists. He found Claimant had reached MMI and required no further treatment.

In the order on appeal, the Commission found Claimant failed to establish a compensable injury arising from an HF exposure. The Commission made 105 findings of fact. It specifically found that Claimant's testimony was "laced with exaggeration and untruths." It stated her contention that she was not aware she had preexisting restrictive lung disease was not credible. The Commission noted Claimant's preexisting hypertension and osteoarthritis and found her claim that these conditions had resolved before the incident was not credible. The Commission found Claimant's preexisting kidney disease was a risk factor to heart block and further found there was no basis for her assertion that the preexisting numbness and tingling in her hands was aggravated by the incident. The Commission noted the inconsistency in Claimant's dual complaints of loss of taste and smell and sensitivity to odors. It found Claimant's medical records did not support her assertion that she had memory problems stemming from an HF exposure. It found various other post-exposure physical and mental symptoms that Claimant complained of were inconsistent and not supported by her medical records.

The Commission noted Claimant seemed "angry and indignant", and it gave greater weight to Claimant's coworkers' testimony and the findings of Dr. Early, Dr. MacKinnon, Dr. Feldman, Dr. Aquilina, Dr. Mitchell, and Dr. Spangenthal. It gave less weight to Dr. Edelman's report because he did not personally examine Claimant, most of his opinions were not to a reasonable degree of medical

certainty, and he did not have accurate knowledge of the circumstances of Claimant's exposure. Additionally, it relied less on Dr. Lane's report than Dr. Feldman's because it noted, in part, that Dr. Lane did not actually review medical records from a twenty-six-year-old syncopal episode that she believed combined with the effects from Claimant's HF exposure to cause the heart injury. Dr. Lane also was unaware of Claimant's preexisting hypertension, kidney disease, and PFT results and based her opinion on Claimant's subjective complaints. The Commission discounted Dr. Setaro's report because he did not consider Claimant's preexisting medical conditions. It also noted the medical evidence did not support his conclusion that there was "no other conceivable reason" for Claimant's heart block.

As to Claimant's heart injury, the Commission stated "the evidence suggests the delayed onset of AV heart block is wholly inconsistent with the mechanism of injury to be expected from HF exposure, which is an immediate onset coupled with evidence of electrolyte imbalance, neither of which were present in this claim." The Commission found any pulmonary injuries Claimant suffered from the HF exposure resolved quickly, as expected.

The Commission emphasized the brevity of Claimant's exposure and the dilution of any HF to which she was exposed. It noted this case was "not just a 'battle of the experts'" but was also affected by the "salient inconsistencies" in Claimant's testimony and subjective complaints to medical providers. The Commission stated:

> The evidence of this claim supports finding the Claimant was exposed to HF vapors and experienced immediate symptoms involving shortness of breath and coughing. The objective medical reports show these immediate symptoms resolved within days, even though the Claimant's subjective testimony stands to the contrary. The Claimant was capable of performing her job in the aftermath of her exposure, however, and was only incapacitated from employment when she developed AV heart block, which the Commission finds to be an unrelated, thus not compensable, condition. Moreover, the Claimant alleges her ongoing incapacity for employment is related to chronic pulmonary disability which, while potentially true, is also unrelated to her

exposure to HF vapors as this disability was shown to pre-exist her injury.

This appeal followed.

## ISSUE ON APPEAL

Did the Commission err in finding Claimant did not sustain a permanent injury by accident arising out of an HF exposure?

## STANDARD OF REVIEW

"The South Carolina Administrative Procedures Act (APA) establishes the standard for judicial review of decisions of the Workers' Compensation Commission." *Bass v. Isochem*, 365 S.C. 454, 467, 617 S.E.2d 369, 376 (Ct. App. 2005); *see also* S.C. Code Ann. § 1-23-380 (Supp. 2023). The Commission decides questions of fact by the preponderance of the evidence standard. *Paulino v. Diversified Coatings, Inc.*, 443 S.C. 150, 155, 903 S.E.2d 503, 506 (2024). This court "may reverse or modify the [Commission's] decision if substantial rights of the appellant have been prejudiced because the [Commission's] findings, inferences, conclusions, or decisions are . . . affected by other error of law [or] clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." *Frampton v. S.C. Dept. of Nat. Res.*, 432 S.C. 247, 256, 851 S.E.2d 714, 719 (Ct. App. 2020) (final alteration in original) (quoting § 1-23-380(5)(d), (e)); *see also Gadson v. Mikasa Corp.*, 368 S.C. 214, 221, 628 S.E.2d 262, 266 (Ct. App. 2006) ("Pursuant to the APA, this [c]ourt's review is limited to deciding whether the appellate panel's decision is unsupported by substantial evidence or is controlled by some error of law."). In workers' compensation cases, the Commission is the ultimate fact finder, and its findings are presumed correct and will not be set aside unless unsupported by substantial evidence in the record. *Holmes v. Nat'l Serv. Indus., Inc.*, 395 S.C. 305, 308, 717 S.E.2d 751, 752 (2011). "'Substantial evidence' is not a mere scintilla of evidence[,] nor the evidence viewed blindly from one side of the case, but is evidence which, considering the record as a whole, would allow reasonable minds to reach the conclusion that the administrative agency reached . . . in order to justify its action." *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981) (quoting *Law v. Richland Cnty. Sch. Dist. No. 1*, 270 S.C. 492, 495–96, 243 S.E.2d 192, 193 (1978)).

## LAW/ANALYSIS

Claimant asserts the Commission erred in finding she failed to establish a compensable injury from HF exposure because it ignored certain medical testimony. Claimant also argues the Commission erred in commenting on Claimant's credibility because her credibility had no bearing on the medical evidence in this case. We disagree.

As the Commission noted in its order, "[a] great deal of medical evidence was submitted" in this case. This case is designated as medically complex, involving conflicting medical evidence and testimony regarding Claimant's cardiac and pulmonary injuries; therefore, the Commission's factual findings are conclusive unless they are not supported by substantial evidence in the record. *See Grayson v. Carter Rhoad Furniture*, 317 S.C. 306, 309, 454 S.E.2d 320, 321–22 (1995) ("Where there is conflicting medical evidence, the findings of fact of the commission are conclusive."). "In medically complex cases, an employee shall establish by medical evidence that the injury arose in the course of employment. . . . '[M]edically complex cases' means sophisticated cases requiring highly scientific procedures or techniques for diagnosis or treatment excluding MRIs, CAT scans, x-rays, or other similar diagnostic techniques." S.C. Code Ann. § 42-1-160(E) (2015).

The record indicates Claimant was briefly exposed to a leak containing diluted HF, inhaling "three, no more than four" breaths while in the vicinity of the leak on an open-air patio. Claimant alleges that through this exposure, she suffered cardiac, pulmonary, orthopedic, and neurological injures; experienced a loss of taste and smell; and sustained post traumatic stress disorder. However, substantial evidence supports the Commission's conclusion that the medical evidence and hearing testimony do not substantiate the allegations of injury. Dr. MacKinnon and Dr. Early emphasized the brief nature of Claimant's exposure in their reports. Dr. Mitchell stated Claimant described a "significant" inhalation event to him, yet he found no correlation between the exposure and Claimant's symptoms. Claimant's coworkers stated Claimant was not coughing, displaying any facial redness, having difficulty talking, or complaining of respiratory distress within twelve hours after the incident. The record reflects that Claimant was morbidly obese and had mild to moderate preexisting restrictive lung disease, which dated back to at least 1993. Claimant's previous employment required her to undergo several PFTs from 2008 to 2011, which all showed Claimant suffered from restrictive lung disease. Claimant failed PFT prior to starting work for Employer. Claimant also had preexisting hypertension and osteoarthritis, which required her to take beta blockers, certain medications with diuretic properties, and medication for muscle spasm and pain, all of which she was taking at the time of her exposure to HF.

Claimant underwent a cardiac workup in 2007 for an irregular heartbeat, and in 2014, doctors changed her hypertension medication because of bradycardia. The reports of Dr. Early, Dr. Mitchell, and Dr. Spangenthal directly linked Claimant's post-exposure medical problems to her preexisting conditions. The Commission's consideration of the circumstances of Claimant's exposure and of Claimant's previous medical history in making its final determination is supported by substantial evidence.

In contrast to Claimant's assertion that the Commission ignored certain medical evidence, the Commission closely examined all of the medical evidence presented in this case and gave detailed explanations regarding its method of assigning greater weight to certain medical testimony. We find substantial evidence supports the Commission's decision to give greater weight to the well-reasoned findings of Dr. Early, Dr. MacKinnon, Dr. Feldman, Dr. Aquilina, Dr. Mitchell, and Dr. Spangenthal.

Claimant sought medical attention five times for her HF exposure: approximately twelve hours after her shift ended and on August 13, 15, 19, and 21. At each of these visits, the physician's assistants reported no cough or shortness of breath, Claimant denied chest pressure or pain, and Claimant's chest, lungs, and breath sounds were all normal. Further, at each visit, Claimant was able to articulate well with normal speech, volume, and coherence. During each medical evaluation, Claimant's blood lab results were normal, with calcium and magnesium both in normal ranges. Both Dr. Early and Dr. MacKinnon stated negative cardiac effects of an HF exposure are revealed by significant reduction of calcium and magnesium levels in the blood within twenty-four to forty-eight hours after an HF exposure. Even though doctors discovered Claimant suffered from a heart block during her August 21 hospitalization, several doctors opined Claimant's HF exposure was not the cause of her heart block. Dr. Early stated Claimant's dyslipidemia, hypertension, and obesity were likely the cause of her heart block. Dr. Feldman stated "it is physiologically impossible that there is a causal relationship between HF and high-grade heart block" because Claimant's electrolytes were normal on three different blood draws after the HF exposure. Dr. Aquilina stated that most causes of heart block are unknown and that he did not know if Claimant's HF exposure was the cause of her heart block. Finally, Dr. Lane based her opinion that Claimant's HF exposure caused her heart block on a twenty-six-year-old fainting episode that was not present in any of Dr. Lane's treatment records.

Regarding Claimant's lung injury, Dr. Mitchell opined Claimant's HF exposure did not cause permanent injury to her lungs because her PFT results following the HF

exposure were similar to those preceding the HF exposure. Also, during Dr. Mitchell's medical exam, he did not observe Claimant wheezing and her lungs were bilaterally clear. Dr. Spangenthal stated Claimant's weight and morbid obesity could account for her shortness of breath and that Claimant's HF exposure had no long-term negative impact on Claimant's pulmonary system.

Because there was a vast amount of medical testimony and medical records and because some of the medical testimony was conflicting, this case required the Commission to give greater weight to certain evidence. "The possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's findings from being supported by substantial evidence." *Liberty Mut. Ins. Co. v. S.C. Second Inj. Fund*, 363 S.C. 612, 620, 611 S.E.2d 297, 301 (Ct. App. 2005). When evidence conflicts, either in testimony given by different witnesses or by the same witness, the Commission's factual findings are conclusive. *Anderson v. Baptist Med. Ctr.*, 343 S.C. 487, 492–93, 541 S.E.2d 526, 528 (2001); *see Grayson*, 317 S.C. at 309, 454 S.E.2d at 321–22 ("Where there is conflicting medical evidence, the findings of fact of the [C]ommission are conclusive."). "[I]t is not for this court to balance objective against subjective findings of medical witnesses, or to weigh the testimony of one witness against that of another." *Potter v. Spartanburg Sch. Dist. 7,* 395 S.C. 17, 24, 716 S.E.2d 123, 127 (Ct. App. 2011) (quoting *Sanders v. MeadWestvaco Corp.*, 371 S.C. 284, 292, 638 S.E.2d 66, 71 (Ct. App. 2006)). "That function belongs to the [Commission] alone." *Id.*

Claimant argues the Commission erred in making *any* findings about Claimant's credibility because this is a medically complex case in which "the threshold for compensability is established by the weight of the incontrovertible medical evidence." We disagree. We find that Claimant's credibility was relevant in this case because, as noted by the Commission, in some instances her statements to medical providers were not borne out by medical examinations and further, inconsistencies in her testimony led to questions about the circumstances of the exposure itself. The extent of Claimant's exposure had a direct bearing on most of the medical testimony. "The final determination of witness credibility and the weight to be accorded evidence is reserved to the . . . Commission." *Brunson v. Am. Koyo Bearings*, 395 S.C. 450, 455, 718 S.E.2d 755, 758 (Ct. App. 2011) (quoting *Frame v. Resort Servs. Inc.*, 357 S.C. 520, 528, 593 S.E.2d 491, 495 (Ct. App. 2004)). "The reason [appellate courts] . . . affirm findings [of credibility] derives from a principle that applies beyond credibility to all factual determinations of the [C]ommission: 'an award must be founded on evidence of sufficient substance to afford a reasonable basis for it.'" *Crane v. Raber's Disc. Tire Rack*,

429 S.C. 636, 643, 842 S.E.2d 349, 352 (2020) (quoting *Hutson v. S.C. State Ports Auth.*, 399 S.C. 381, 387, 732 S.E.2d 500, 503 (2012)). When, as here, "the [C]ommission's factual determination is 'founded on evidence of sufficient substance," and the evidence 'affords a reasonable basis' for the commission's decision in the case, the evidence meets the 'substantial evidence' standard and we are bound by the decision." *Id.* (quoting *Hutson*, 399 S.C. at 387, 732 S.E.2d at 503).

**CONCLUSION**

Accordingly, the order of the Commission is

**AFFIRMED.**[4]

**WILLIAMS, C.J., and KONDUROS and MCDONALD, JJ., concur.**

---

[4] We decide this case without oral argument pursuant to Rule 215, SCACR.